UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAMMY STRAIN,<br><br>    Plaintiff,<br><br>    vs.<br><br>EDDIE LEVERT, WALTER WILLIAMS, O'JAYS INC., PHILADELPHIA INTERNATIONAL RECORDS, ASSORTED MUSIC, INC., GAMBLE-HUFF PRODUCTIONS, KENNETH GAMBLE, LEON HUFF, CHUCK GAMBLE,<br><br>    Defendants. | Civil Action No.<br><br>Jury Trial Demanded |

Plaintiff, Sammy Strain, brings a series of claims against the defendants, of which the following is a statement:

**JURISDICTION AND VENUE**

1.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1338(a) in that the matter in controversy exceeds the sum of value of $75,000, exclusive of interest and costs, and is between citizens of different States, and this action also arises under the copyright laws of the United States, 17 U.S.C. §101, et seq. This Court may exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367. Venue is properly laid in this judicial district pursuant to 28 U.S.C. §1391 in that a substantial part of the events or omissions giving rise to this case occurred in this judicial district and at least one defendant resides in this judicial district.

## THE PARTIES

2. Plaintiff Sammy Strain is a resident of New Jersey and was at all material times a professional singer of the musical genre popularly known as Rhythm & Blues ("R&B"), and was a member of the R&B music group known as the O'Jays from 1976 until 1992. Sammy started performing with the O'Jays in 1976 due to the terminal illness of an original member of the group named William Powell. At that time the O'Jays were recording under the PIR label and their music was produced by G-H Productions. The O'Jays were a very popular recording group and were arguably the highest gross earnings act for the PIR label throughout the 1970's and 1980's. In 1977 William Powell died and Sammy replaced him permanently in the O'Jays group; later that year, Sammy and the O'Jays recorded the certified gold album "Travelin at the Speed of Thought." Under the terms of the recording agreements that existed between the members of the O'Jays and PIR, Sammy became a member of the O'Jays when he replaced William Powell in the group and from that point forward he was entitled and liable to the terms and conditions of the recording contract(s) then in force and was entitled to a share of the royalties being paid to the O'Jays by PIR. From 1977 until the present day Sammy has not been paid "one dime" in royalty payments from his voice recordings with the O'Jays, nor has he received any royalty accounts or other financial statements reflecting the amount of royalties due and owing to the O'Jays from PIR.

3. Defendant Eddie Levert is a resident of Nevada and is an R&B singer and one of the original members of the O'Jays. Levert, acting in concert with Williams, Gamble, Huff, PIR and Assorted, conspired to and did fraudulently induce Sammy to perform on the O'Jays sound recordings with the intention of depriving him of his royalty payments from those recordings by falsely telling him that he was not owed any royalty payments.

4. Defendant Walter Williams is a resident of Ohio and is an R&B singer and one of the original members of the O'Jays. Williams, acting in concert with Levert, Gamble, Huff, PIR and Assorted, conspired to and did fraudulently induce Sammy to perform on the O'Jays sound recordings with the intention of depriving him of his royalty payments from those recordings by falsely telling him that he was not owed any royalty payments.

5. Defendant OGI is a company incorporated in the state of Ohio having Levert and Williams as its directors and principal shareholders. The company acts as the owner and holder of money and other assets, including royalty payments, collected by Levert and Williams from their performances with the O'Jays group.

6. Defendant Gamble is a resident of Pennsylvania and is a record producer, director and major shareholder of Assorted and PIR. Gamble, acting in concert with Levert, Williams, Huff, PIR and Assorted, conspired to and did fraudulently induce Sammy to perform on the O'Jays sound recordings with the intention of depriving him of his royalty payments from those recordings by falsely telling him that he was not owed any royalty payments.

7. Defendant Huff is a resident of Pennsylvania and is a record producer, director and major shareholder of Assorted and PIR. Huff, acting in concert with Levert, Gamble, Williams, PIR and Assorted, conspired to and did fraudulently induce Sammy to perform on the O'Jays sound recordings with the intention of depriving him of his royalty payments from those recordings by falsely telling him that he was not owed any royalty payments.

8. Defendant PIR is a Pennsylvania corporation and is the record label of the O'Jays and the owner (with Assorted) of the relevant "master" recordings of the group. The defendant Assorted through its subsidiary PIR and its principle directors Gamble and Huff, acting in concert with Levert and Williams, conspired to and did fraudulently induce Sammy to perform

3

on the O'Jays sound recordings with the intention of depriving him of his royalty payments from those recordings by falsely telling him that he was not owed any royalty payments.

9.  Defendant Chuck Gamble is a resident of Pennsylvania and is a director of Assorted and managed the royalty accounts for PIR and Assorted.

**COUNT I**

*FRAUDULENT MISREPRESENTATION*

10.  Defendants Levert, Williams, Gamble, Huff, Assorted, PIR and G-H Productions executed a recording contract dated January 15, 1972 (amended in August 1975) (see Exhibit A attached hereto and made a part hereof), whereby Assorted and PIR would record the music of the group the O'Jays, consisting of Levert, Williams and one William Powell (also a signatory to the 1972 contract). The product of these recording sessions was captured in a fixed medium commonly referred to as "the master recordings" or simply "the masters." The terms of the contract, among other things, called for the O'Jays to be paid a certain rate of royalties from the distribution and exploitation of the masters. Further terms of the contract stated that any leaving member could be replaced by a new member and that when such an event occurred such new member would be bound by the terms of the recording contract then in force between the parties and deemed to be a signatory thereto.

11.  During the year 1976, William Powell became terminally ill with cancer and was unable to perform with the other O'Jays as a group. It was decided between the other parties to the contract that Sammy Strain would replace Mr. Powell as the third O'Jay. During the rest of 1976, Sammy performed with the O'Jays as the replacement for Mr. Powell. By virtue of his performances and under the terms of the 1972 contract (as amended) Sammy became entitled and liable under the terms of that contract as a deemed signatory.

12.     Defendants Levert, Williams, Gamble, Huff, Assorted, PIR and G-H Productions executed a new recording contract dated March 15, 1977 (see Exhibit B attached hereto and made a part hereof), to replace the 1972 contract to a substantial degree; although the terms of the 1977 contract were virtually the same as the 1972 contract and the latter contract referenced and incorporated essential terms of the first as an on-going contractual relationship. At the same time it was realized that Mr. Powell would not recover his health sufficiently to perform with the O'Jays or execute his other duties under the new 1977 contract. Therefore, Sammy Strain was named in the 1977 contract as the replacement for Mr. Powell and his "services" were committed to the O'Jays under the terms and conditions of that agreement. The 1977 agreement also had a term whereby any leaving member could be replaced by a new member and that when such an event occurred such new member would be bound by the terms of the recording contract then in force between the parties and deemed to be a signatory thereto.

13.     Defendants Levert, Williams, Gamble, Huff, Assorted, PIR and G-H Productions realizing that Sammy was now going to record masters with the other two O'Jays, conspired that they would not pay Sammy any royalties for his recordings by informing him that he could only seek payment for his "services" from Levert and Williams. The defendants also inserted into the 1977 contract a clause referencing an "exclusive recording agreement" between Sammy Strain, Levert and Williams, which purports to transfer all of Sammy's rights in the recording contracts of 1977 to Levert and Williams. No such "exclusive recording contract" in fact exists, nor does any writing exist whereby the plaintiff sells, assigns or otherwise transfers his copyrights in the relevant O'Jays masters to anyone. There is also no writing signed by the plaintiff or otherwise which describes in any detail what the services are that the plaintiff is to provide to the defendants or the rate of pay for those services.

5

14. In further execution of their fraudulent scheme, the defendants made express statements to Sammy that in order to continue as a member of the O'Jays he had to agree that he could only seek payment from Levert and Williams for his "services." When making these false statements the defendants and all of them knew that in truth the plaintiff was entitled to royalty payments by virtue of federal law and the terms of the 1977 contract.

15. Also knowing that the plaintiff was of limited education (having only graduated from the 9th grade); and that he was relying solely on the representations made by the defendants and their management agents for advice regarding the terms of his membership as an O'Jay; and that he was depending on continuing as a member of the O'Jays for his livelihood, the defendants induced Sammy to perform and record for the O'Jays under the terms of the 1977 contract while at the same time forcing him to solely "look" to Levert and Williams for payment of his services as a recording artist.

16. Notwithstanding that (i) under the provisions of the Copyright Acts of 1972 and 1976, federal copyrights attached to the O'Jays' masters featuring Sammy Strain's voice, giving the plaintiff property rights in those recordings and entitling him to royalty payments from the exploitation of those masters; and (ii) notwithstanding that the terms of the 1977 contract provide for members of the O'Jays recording under that contract to be paid royalties at a certain rate, the defendants and all of them never paid any royalties to the plaintiff nor did they account to the plaintiff for any royalties they received from the exploitation of the relevant O'Jays masters; this being to the severe economic detriment of Sammy Strain.

17. Despite periodic questions to the defendants by the plaintiff regarding the amount of royalties earned and owing from O'Jays' recordings, the defendants by their fraudulent conspiracy and on-going scheme, kept the plaintiff from ever realizing that he was entitled to

6

royalty payments and entitled to accounts of royalties collected by the defendants, so that he might determine independently whether he actually agrees with that accounting.

18. The fraudulent misrepresentations of the defendants complained of above began in early 1977, continued throughout the successive recording contracts between the O'Jays and Assorted and are continuing to date, causing abiding and ever-increasing economic losses to the plaintiff over the past thirty years. As a result of the fraudulent misrepresentations the defendants made to the plaintiff the plaintiff has suffered losses of at least fifteen million dollars ($15,000,000) and continuing.

## COUNT II

### *BREACH OF CONTRACT*

19. Defendants executed a recording contract between themselves dated March 15, 1977. The agreement set out the full terms and conditions governing the recording of musical works by the R&B singing group the O'Jays. Clause 10 of the contract provides in part that any leaving member could be replaced by a new member and that when such an event occurred such new member would be bound by the terms of the recording contract then in force between the parties and deemed to be a signatory thereto.

20. During the spring of 1977 the plaintiff joined the O'Jays group as the third member replacing William Powell and soon thereafter the plaintiff recorded the album "Travelin' at the Speed of Thought" with the O'Jays.

21. Sammy became a member of the historic and iconic R&B group the O'Jays by virtue of clause 10 of the 1977 contract through his live and recorded performances with the O'Jays. From that point forward until the O'Jays cease to record for PIR in the early 1990's, the plaintiff was a full and integral member of the O'Jays group singing on all master recordings during the period.

7

22.	Clauses 7 and 8 of the 1977 agreement set out the rates and terms for the payment of royalties to the members of the O'Jays who perform on the recording masters. The plaintiff performed as a member of the O'Jays on all of the masters recorded under the 1977 contract; therefore, the plaintiff is entitled to royalty payments under the terms of the 1977 contract for all masters in which his voice appears.

23.	Clause 9 of the 1977 agreement sets out the terms by which Assorted shall account and report on royalties received for the accounts of the royalty artists. Under these terms Assorted was liable to pay royalties and render accounts thereof once per year for the previous six month period.

24.	Contrary to the provisions of clauses 7, 8, and 9, the defendants PIR and Assorted failed to pay royalties and or render accounts therefrom to the plaintiff for the period extending from March 1977 to date. Such breach of contract has caused the plaintiff damages of at least five million dollars ($5,000,000) and continuing.

## COUNT III
### *BREACH OF CONTRACT*

25.	The O'Jays signed a new recording contract with Assorted doing business as PIR dated March 2, 1979 (hereinafter referred to as "the 1979 contract")(see Exhibit C attached hereto and made a part hereof) which was amended by the parties in June 1980 (see Exhibit D attached hereto and made a part hereof), October 1982 (see Exhibit E attached hereto and made a part hereof), and December 1984 (see Exhibit F attached hereto and made a part hereof). By the terms of clauses 16 and 18 of the 1979 contract Levert and Williams warrant to Assorted and PIR that they will furnish the recording services of the plaintiff as a member of the O'Jays to be performed under the terms of the agreement as a whole. On or about March 3, 1979, the plaintiff agreed to perform live and on record as a member of the O'Jays under the terms of the 1979

8

contract. The plaintiff is a signatory of the 1982 and 1984 amendments to the 1979 contract which by their terms incorporate by reference all of the terms of the 1979 agreement. By virtue of the terms of the 1979 contract (as amended) and the surviving terms of the 1977 agreement, Sammy Strain was privy to and part of the 1979 recording contract being entitled and obligated under its terms.

26. Clauses 8 and 9 of the 1979 agreement (as amended) set out the rates and terms for the payment of royalties to the members of the O'Jays who perform on the recording masters. The plaintiff performed as a member of the O'Jays on all of the masters recorded under the 1979 contract 9 (as amended); therefore, the plaintiff is entitled to royalty payments under the terms of the 1979 contract (as amended) for all masters in which his voice appears.

27. Clause 10 of the 1979 agreement (as amended) sets out the terms by which Assorted shall account and report on royalties received for the accounts of the members of the O'Jays who perform on the recording masters. Under these terms Assorted was liable to the plaintiff to pay royalties and render accounts thereof once per year for the previous six month period.

28. Contrary to the provisions of clauses 8, 9, and 10, of the 1979 agreement (as amended) the defendants PIR and Assorted failed to pay royalties and or render accounts therefrom to the plaintiff for the period extending from March 1979 to date. Such breach of contract has caused the plaintiff damages of at least ten million dollars ($10,000,000) and continuing.

### COUNT IV
### *CONVERSION*

29. Under the terms of the 1977 contract (as amended) and the 1979 contract (as amended) the defendants Assorted, PIR, Levert and Williams agreed between themselves that

9

Levert and Williams would be responsible for paying Sammy for all of his services performed as a member of the O'Jays. Pursuant to these agreements from March 1977 to date, Assorted and PIR paid Levert and Williams some monies that were owed to Sammy from his performances on the O'Jays masters, including his royalty payments and kept the balance in accounts controlled by Assorted and PIR. Assorted and PIR also provided Levert and Williams with records of accounts of the O'Jays royalty payments.

30. Notwithstanding that the defendants and all of them knew that the plaintiff was entitled to royalty payments and accountings from his performances on the O'Jays' masters under the terms of the 1977 and 1979 contracts (as amended), when they actually received the O'Jays' royalty payments the defendants converted the royalties of the plaintiff to their own use with the intention of permanently depriving him of his property.

31. As a result of the illegal conversion of the plaintiff's royalty properties by the defendants the plaintiff has suffered damages of at least fifteen million dollars ($15,000,000) and continuing.

## COUNT V
### *UNJUST ENRICHMENT*

32. By virtue of the Copyright Acts of 1972 and 1976, the plaintiff's copyrights attached to the O'Jays' master recordings on which his voice is recorded as a member of the group.

33. Pursuant to an unjust, inequitable and illegal plan executed by the defendants and all of them against the plaintiff from 1977 to date, the defendants have received all of the copyright royalty payments of the plaintiff that were due him from his recordings with the O'Jays and to date have made no payment or accounting to Sammy for these sums.

34. This illegal plan has resulted in an unjust enrichment of the defendants and a corresponding impoverishment of the plaintiff.

35. There is no justification for the unjust enrichment of the defendants at the expense of the plaintiff and although the plaintiff's claims may be time barred by operation of law the defendants should not be allowed to profit from their unjust enrichment at the expense of the plaintiff as a matter of equity.

36. As a result of the unjust enrichment of the defendants at the expense of the plaintiff the plaintiff has suffered damages of at least fifteen million dollars ($15,000,000) and continuing.

## COUNT VI

### *BREACH OF COPYRIGHT LICENSE*

37. Between the years 1977 through 1991, Plaintiff was a member of the R&B singing group the O'Jays.

38. In successive contracts signed in March of 1977 (Exhibit B) and March of 1979 (Exhibit C), defendants Assorted, PIR, Levert and Williams, for valuable consideration, entered into several contracts in writing under which defendants Assorted and PIR agreed to make master recordings (the "masters") and then sell records, cassette tapes, 8-track tapes, CDs, DVDs and other recorded medium containing the vocals of the O'Jays from these masters throughout the United States and other countries.

39. As a member of the O'Jays whose vocals are captured on the master recordings made by the O'Jays singing group, Plaintiff is a co-author of copyrighted "joint works" created by those master recordings as defined under the Copyright Act of 1976, 17 U.S.C. §101.

11

40. By operation of law and by virtue of clauses 6, 7, 8, 9, and 34 of the 1977 contract (as amended) and clauses 5, 6, 7, 8, 9, 10, and 15(b) of the 1979 contract (as amended), Plaintiff granted a non-exclusive license to defendants Assorted, PIR, Levert and Williams to use his vocal performances as recorded on the O'Jays master recordings in exchange for royalty payment to be made on the same terms as those received by the other two members of the O'Jays, defendants Levert and Williams.

41. Under these contracts and their amendments, defendants Assorted, PIR, Levert and Williams agreed to pay Plaintiff as a member of the O'Jays royalties at various rates depending on various factors as set out in those contracts.

42. Between 1977 and 1991, the O'Jays recorded at least 10 album masters containing the vocal performances of Plaintiff under the terms of the 1977 contract (as amended) and the 1979 contract (as amended). Defendants Assorted, PIR, Levert and Williams permitted and facilitated the sale of at least 5.4 million recordings from these masters. For these sales, defendants received a gross selling price of not less than $12 per recording.

43. Under the 1977 contract (as amended) and the 1979 contract (as amended), Plaintiff became entitled to royalties in a sum of no less than $15 million.

44. No part of this sum has been paid by or on behalf of defendants to Plaintiff, despite Plaintiff's demand for payment.

## JURY DEMAND

45. Plaintiff demands a trial by jury of the causes of action asserted herein.

## PRAYER FOR RELIEF

On COUNT I, Plaintiff Sammy Strain requests that this Court enter judgment:

a.	Against the defendants and in favor of the plaintiff for actual damages in the amount of Fifteen Million Dollars ($15,000,000);

b.	Against the defendants and in favor of the plaintiff for special damages arising from the loss of income and investment opportunities from 1977 to date;

c.	For punitive and exemplary damages as determined by the trier of fact; and

d.	Against the defendants and in favor of the plaintiff for the costs and disbursements of this action, including reasonable attorneys' fees.

On COUNT II, Plaintiff Sammy Strain requests that this Court enter judgment:

a.	Requiring the defendants to account to the plaintiff for all moneys the defendants received directly or indirectly as the plaintiff's share of copyright royalties from the sale and distribution of O'Jays recordings made under the terms of the 1977 contract (as amended) and featuring the voice of the plaintiff from March 1977 to date;

b.	Following the accounting, that the Court enter judgment in favor of the plaintiff and against the defendants for the amount found due, with interest from March 1977;

c.	Against the defendants and in favor of the plaintiff for the costs and disbursements of this action, including reasonable attorneys' fees; and

d.	For such other and further relief that the Court deems appropriate.

On COUNT III, Plaintiff Sammy Strain requests that this Court enter judgment:

a.	Requiring the defendants to account to the plaintiff for all moneys the defendants received directly or indirectly as the plaintiff's share of copyright royalties from the sale and distribution of O'Jays recordings made under the terms of the 1979 contract (as amended) and featuring the voice of the plaintiff from March 1979 to date;

  b. Following the accounting, that the Court enters judgment in favor of the plaintiff and against the defendants for the amount found due, with interest from March 1979;

  c. Against the defendants and in favor of the plaintiff for the costs and disbursements of this action, including reasonable attorneys' fees; and

  d. For such other and further relief as the Court deems appropriate.

 On COUNT IV, Plaintiff Sammy Strain requests that this Court enter judgment:

  a. Requiring the defendants to account to the plaintiff for all moneys the defendants converted to their own use directly or indirectly from the plaintiff's share of copyright royalties from the sale and distribution of O'Jays recordings made under the terms of the 1977 contract (as amended) and the 1979 contract (as amended) and featuring the voice of the plaintiff from March 1977 to date;

  b. Following the accounting, that the Court enters judgment in favor of the plaintiff and against the defendants for the amount found due, with interest from March 1977;

  c. Against the defendants and in favor of the plaintiff for the costs and disbursements of this action, including reasonable attorneys' fees;

  d. For such other and further relief as the Court deems appropriate.

 On COUNT V, Plaintiff Sammy Strain requests that this Court enter judgment:

  a. Requiring the defendants to account to the plaintiff for all moneys the defendants unjustly received directly or indirectly as the plaintiff's share of copyright royalties from the sale and distribution of O'Jays recordings made under the terms of the 1977 contract (as amended) and the 1979 contract (as amended) and featuring the voice of the plaintiff from March 1977 to date;

  b. Following the accounting, that the Court enters judgment in favor of the plaintiff and against the defendants for the amount found due, with interest from March 1977; and

  c. For such other and further relief as the Court deems appropriate.

ON COUNT VI, Plaintiff Sammy Strain requests that this Court enter judgment:

  a. For an accounting of all sales of the recordings of the O'Jays made from the masters and sold from March 1977 to date;

  b. For payment of royalties due under the contracts as shown in the accounting, but in no event less than the sum of $15 million;

  c. For pre-judgment interest on unpaid royalties as allowed by law;

  d. For Plaintiff's reasonable attorney's fees on account of the 1977 contract (as amended) and the 1979 contract (as amended);

  e. For costs of suit; and

  f. For such other and further relief as the Court deems appropriate.

---

Robert Thomas Vance Jr (RTV3988)  
Law Offices of Robert T Vance Jr  
100 South Broad Street, Suite 1530  
Philadelphia PA 19110  
215 557 9550  
215 557 9552 f  

    and  

Charles A Whittier  
The Whittier Law Firm, P.C.  
233 Broadway, Suite 531  
New York NY 10279  
212 269 2111  
212 766 4006 f  

Attorneys for the Plaintiff