

Robert T. Vance, Jr.
Charles A. Whittier, III.
Law Offices of Robert T. Vance, Jr.
100 South Broad Street (Ste. 1530)
Philadelphia, PA 19110
215-557-9550

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SAMMY STRAIN, | : | Case No.: 07-734 |
| Plaintiff, | : | AFFIDAVIT OF SAMMY STRAIN IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| vs. | : | |
| EDDIE LEVERT, WALTER WILLIAMS, | : | |
| O'JAYS GIGS INC., PHILADELPHIA | : | |
| INTERNATIONAL RECORDS, ASSORTED | : | |
| MUSIC, INC., GAMBLE-HUFF | : | |
| PRODUCTIONS, KENNETH GAMBLE, | : | |
| LEON HUFF, CHUCK GAMBLE, | : | |
| Defendants | | |



1. I, Sammy Strain, the Plaintiff in this action, make this affidavit in opposition to the Defendants Eddie Levert and Walter Williams Motion to Dismiss the Complaint filed in this action and I hereby swear it to be true to the best of my knowledge.

2. I have been shown a copy of the purported Employment Agreement between myself and a corporation named GSW&E, dated May 1, 1977, and referred to in the Defendants Lavert and

Williams Motion to Dismiss the Complaint in this case (hereinafter referred to as "the GSWE contract").

3. I have carefully read the terms contained in the GSWE contract and I do not recall ever signing such a document in 1977 or at all. In particular, the amount of compensation quoted in the GSWE contract ($20,000 per year) is significantly less than what I was actually receiving in yearly compensation for my live performances with the O'Jays. From the start of my singing career with the O'Jays in 1976, I was receiving at least $1,000 per week, whether I performed or not. These payments continued and increased throughout my tenure with the O'Jays.

4. I have also been shown a copy of the purported Employment Agreement between myself and a corporation named O'Jays Inc., dated May 1, 1977, and referred to in the Defendants Lavert and Williams Motion to Dismiss the Complaint in this case (hereinafter referred to as "the OJ Inc. contract").

5. I have carefully read the terms contained in the GSWE contract and I do not recall ever signing such a document in 1977 or at all. In particular, the amount of compensation quoted in the GSWE contract ($500 per year) is significantly less than what I was actually receiving in yearly compensation for my live performances with the O'Jays. From the start of my singing career with the O'Jays in 1976, I was receiving at least $1,000 per week, whether I performed or not.

6. I find it strange and extraordinary that I would have signed two contracts, with two different companies wherein I am assigning my "exclusive services" to both companies. I do not believe that I actually signed these documents.

7. I have examined the signatures of both documents and I would have to examine the original signature pages of both contracts to determine if the signatures alleged to be mine were genuine.

8. The performance payments that I received from the O'Jays were compensation for my live performances with the group. These were not royalty payments, although I regularly asked the

Defendants about my royalty payments from record sales and I was always told that the O'Jays were not receiving any royalty payments because of "recoupment expenses" and other debts to the defendants Philadelphia International Records, Assorted Music, Inc., and Gamble-Huff Productions.

May 16, 2007

_____
Notary

_____
Sammy Strain